UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ROBIN GAFFNEY, POLYCARPE KALEMBWE AND
ALBERT STEWART,

|  |  |
|---|---|
| Plaintiffs, | COMPLAINT |
|  | Case No. 04 CV 10179 (VM) |
|  | JURY TRIAL  DEMANDED |

       -against-

THE DEPARTMENT OF INFORMATION
TECHNOLOGY AND TELECOMMUNICATIONS,
NYC-TV formerly known as Crosswalks Television,
CITY OF NEW YORK, ARICK WIERSON, YOCASTA
DELGADO, WALTER GARAICOA,
MICHAEL MCKENNA, and SETH UNGER

                              Defendants.
------------------------------------------------------------------------X

      Plaintiffs, Robin Gaffney, Polycarpe Kalembwe and Albert Stewart, by their attorney, Eugenie Gilmore, Esq. for their complaint against the Defendants,  The Department of Information Technology and Telecommunications, NYC-TV formerly known as Crosswalks Television, City of New York and Arick Wierson, Yocasta Delgado, Walter Garaicoa , Michael McKenna and Seth Unger allege as follows:

<u>INTRODUCTORY STATEMENT</u>

      1. This action is brought to remedy discrimination in employment on the basis of race, color, age, gender, disability and retaliation, in violation of  in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000 et seq. ( "Title VII") and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C.A. Sec. 621 et seq., the Civil Rights Act of 1866, 42 U.S.C. 1981, and 42 U.S.C. 1983.  The Plaintiffs also bring supplementary State and City discrimination claims based on discrimination and retaliation, in the terms, conditions and privileges of employment, as protected under the New York State Human Rights Law, Executive Law Sec. 290 <u>et</u> seq. (the "Human Rights Law"); and the Administrative Code of the City of New York Secs. 8-101 et seq. (the "Administrative Code").

      2.  Plaintiffs seek injunctive and declaratory relief, economic, compensatory, and punitive damages and other appropriate legal and equitable relief pursuant to federal, state and municipal law.

## JURISDICTION AND VENUE

3. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. 1331 and 1343 (a)(4), 42 U.S.C. 12117 and 42 U.S.C. 20000e-5 (f). Supplemental jurisdiction of the court over the State and Municipal Claims is based upon 28 U.S.C. Sec 1331.

4. The unlawful employment practices alleged below were committed within this District. Accordingly, venue lies within the United States District Court for the Southern District of New York.

5. Defendants are covered employers for the purposes of Title VII, the ADEA, Civil Rights Act of 1866, 42 U.S.C. 1981; 42 U.S.C. 1983, the Human Rights Law and the Administrative Code.

6. A copy of this complaint was served on Corporation Counsel of the City of New York and the New York City Human Rights Commission prior to the filing of this action.

7. Plaintiffs have fully complied with all prerequisites to jurisdiction in this court.

8. The Plaintiffs filed a timely charge of discrimination against Defendants, the Department of Information, Technology and Telecommunications, NYC-TV formerly known as Crosswalks Television, and the City of New York with the Equal Employment Opportunity Commission on October 27, 2003.

9. On or about September 1, 2004 Plaintiffs requested a Right to Sue letter.

10. On or about September 29, 2004, the EEOC issued a notice informing, Plaintiffs, Polycarpe Kalembwe and Albert Stewart of their right to sue Defendants in federal court with respect to the ADEA charges. The Notice was received on or about October 15, 2004.

11. On or about November 8, 2004, the United States Department of Justice issued Plaintiffs, Robin Gaffney and Albert Stewart a notice informing them of their right to sue Defendants in federal court with respect to the Title VII charges and Polycarpe Kalembwe with respect to Title VII and ADA charges.

12. This complaint is being filed within 90 days of Plaintiffs' receipt of the EEOC notice and the Department of Justice letters.

13. Plaintiffs have fully complied with all prerequisites to jurisdiction in this court.

## PARTIES

14. Plaintiff, Robin Gaffney is a resident of the City of New York, County of Queens, State of New York.

15. Plaintiff Robin Gaffney was, at all times relevant, employed by defendants.

16. Ms. Gaffney is a black female.

17. Plaintiff, Polycarpe Kalembwe is a resident of the City of New York, County of Queens, State of New York.

18. Plaintiff Polycarpe Kalembwe was, at all times relevant, employed by defendants.

19. Mr. Polycarpe is a black male who was, at all times relevant, over the age of 40.

20. Mr. Polycarpe has a disability of diabetes.

21. Mr. Polycarpe was able to perform his duties with this disability.

22. Plaintiff, Albert Stewart, is a resident of the City of New York, County of Kings, State of New York.

23. Plaintiff Albert Stewart was, at all times relevant, employed by defendants.

24. Mr. Stewart is a black male who was, at all times relevant, over the age of 40.

25. Defendant, the City of New York Department of Information Technology and Telecommunications, (hereinafter DoITT) is an agency of the City of New York.

26. Crosswalks was a group of cable channels set aside for educational and governmental use and supervised by the City of New York and administered by DoITT. Crosswalks is now known as NYC-TV. It is still supervised by the City of New York and administered by DoITT. The address of DoITT is 11 Metrotech, Brooklyn, New York. The address of NYC-TV is 1 Centre Street, New York, New York 10007.

27. The City of New York is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

28 . Arick Wierson was, at all times relevant, the General Manager of Crosswalks.

29. On September 23, 2002, Arick Wierson was appointed General Manager of Crosswalks on an acting basis. He had previously been employed as the Deputy General Manager of Crosswalks.

30. Mr. Wierson is sued in his individual and managerial capacities. He is an employer or agent of the employer within the laws of discrimination.

31.Yocasta Delgado was, at all times relevant, the Director of Administration at Crosswalks for the Crosswalks employees paid on the Research Foundation of the City University of New York (RF CUNY) Crosswalks budget.

32.  Ms. Delgado is being sued in her individual and managerial capacities. She is an employer or agent of the employer within the laws of discrimination.

33. Michael McKenna was, at all times relevant, the Senior Operations Manager of Crosswalks.

34. Mr. McKenna is sued in his individual and managerial capacities. He is an employer or agent of the employer within the meaning of the laws of discrimination.

35. Seth Unger was, at all times relevant, the Director of Programming.

36. Mr. Unger is sued in his individual and managerial capacities. He is an employer or agent of the employer within the meaning of the laws of discrimination.

37. Walter Gariacoa was, at all times relevant, the Senior Editor.

38.  Mr. Gariacoa  is sued in his individual and managerial capacities. He is an employer or agent of the employer within the meaning of the laws of discrimination.

## FACTUAL ALLEGATIONS

39.  DoITT maintained two different budget lines for its Crosswalk employees.

40. One line was the DoITT line and the other was the Research Foundation of the City University of  New York (hereinafter RF CUNY).

41.  DoITT transferred funds to RF CUNY for payment of staff positions.

42.  The portion of the staff of Crosswalks that were paid from the CUNY RF payroll were employees of Crosswalks and DoITT.

43. Positions that are paid from the DoITT Crosswalks budget are civil service.

44.  When DoITT or Crosswalks filled a new position on the DoITT  budget, the position was required to be posted.

45.  It was required that the posting include information concerning the Civil Service title, office or functional title, salary, job duties and Civil Service requirements.

4

46. The document which is required to be used to initiate the hiring process is a form called "Request to Fill Position".

47. Renalda Medina, the Director of Human Resources was the personnel administrator for employees paid on the DoITT Crosswalk budget.

48. Yocasta Delgado, was the administrator for the employees paid on the DoITT Crosswalks budget.

49. Ms. Delgado's duties included processing RF CUNY time sheets, updating the time and leave record files, issuing monthly updates of Time/Leave balances to RF CUNY employees, and maintaining personnel files.

50. Ms. Delgado was paid on the RF CUNY Crosswalks budget.

51. Ms. Delgado has been retained or was hired into a new position at DoITT.

52. Robin Gaffney was employed by defendants, since November 29, 1999.

53. Ms. Gaffney was paid from the DoITT Crosswalks budget line.

54. Ms. Gaffney was employed as a Producer.

55. Ms. Gaffney was qualified for her job.

56. Ms. Gaffney was performing very well.

57. On May 2, 2003, Ms. Gaffney was called to a meeting with Renalda Medina, the Director of Human Resources and Michael McKenna, the Senior Operations Manager who also was her Executive Producer.

58. Ms. Gaffney was told that due to a budget crisis, her employers were forced to let someone go and they had chosen her.

59. Ms. Gaffney was as qualified if not more qualified than those retained.

60. At the time of Ms. Gaffney's termination, she was acting as a Senior Producer.

61. Ms. Gaffney was never given the title of Senior Producer even though she was given and performed the tasks of a senior producer.

62. Ms. Gaffney had created and produced original shows.

63. Ms. Gaffney had created and produced a show called "Cultural Corners".

64. At the time of her termination, she had produced 18 episodes of "Cultural Corners".

65. Ms. Gaffney had also created and produced a new show, called "Coming of Age: Emerging Issues in Aging".

66. At the time of her termination, Ms. Gaffney had produced 4 of 6 episodes of "Coming of Age: Emerging Issues in Aging".

67. After Ms. Gaffney was hired, DoITT hired a white female named Adele Merlino.

68. Ms. Merlino was hired as an assistant to the then General Manager, Sara Porath.

69. Ms. Merlino was not hired as a producer.

70. However, after working as Ms. Porath's assistant for a short time, Ms. Merlino began producing.

71. Ms. Merlino who is a white female producer, was retained.

72. Ms. Gaffney made less salary than Ms. Merlino.

73. Ms. Gaffney had been producing a traffic show. When Mr. Wierson came to Crosswalks, this program was taken away from Ms. Gaffney and given to Ms. Merlino.

74. At the time of Ms. Gaffney's termination, there was one full time white male producer.

75. At the time of Ms. Gaffney's termination, there was also one white male and two white females working as free lance producers who had started working more recently than Ms. Gaffney.

76. Ms. Gaffney asked whether she could be kept on as free lance.

77. This was refused.

78. There were no black full time producers.

79. There were no black senior producers.

80. Mr. Unger coordinated the assignments of the producers.

81.  Mr. Unger is a white male.

82. Upon information and belief he had no background in television prior to starting at Crosswalks .

83.  Arick Wierson had no experience or background in televison.

84.  Ms. Gaffney was never given a promotion.

85. Ms. Gaffney never received a merit raise.

86.  At the time Ms. Gaffney was terminated or shortly thereafter, two jobs were posted called Segment Coordinator.

87. A Segment Coordinator is a producer.

88.  These jobs were posted with a salary range that started higher than the salary Ms. Gaffney was making.

89. Ms. Gaffney was qualified for these positions.

90. There also was a senior producer position posted on the Internet only days after Ms. Gaffney was told she was being let go.

91.  The segment coordinator and senior producer positions were posted with a salary range that started higher than the salary Ms. Gaffney was making.

92.  Three white females were hired into the production area.

93. One worked as a full time producer, one worked as an associate producer and one worked  part time.

94. Ms. Gaffney was not hired for these positions.

95.  Ms. Gaffney was qualified for these positions.

96.  Ms. Gaffney was not offered any other positions at Crosswalks or DoITT.

97. The Crosswalks staff who were paid from the RF CUNY budget were told in March, 2003  that June 6, 2003 would be their last day of employment because DoITT would not be renewing the Memorandum of Agreement with RF CUNY.

98. In addition to the producer positions, jobs had been posted for the DoITT Crosswalks

budget line for the same work that was being done by RF CUNY employees.

99.  Ms. Gaffney asked Yocasta Delgado if she could apply for the producer positions.

100.  Ms. Delgado told Ms. Gaffney that she was not at liberty to say but that the postings were there to give the opportunity for RF CUNY Crosswalks employees  to apply. Ms. Delgado told Ms. Gaffney that in a couple of days she would understand.

101.   Upon information and belief,  Arick Wierson aided and abetted in the discriminatory acts against Ms. Gaffney.

102.  Upon information and belief, Walter Garaicoa aided and abetted in the discriminatory acts against Ms. Gaffney.

103.  Upon information and belief, Seth Unger aided and abetted in the discriminatory acts against Ms. Gaffney.

104.  Upon information and belief, Arick Wierson took part in the decision to terminate Ms. Gaffney.

105.   Upon information and belief, Walter Garaicoa took part in the decision to terminate Ms. Gaffney.

106.    Upon information and belief, Seth Unger took part in the decision to terminate Ms. Gaffney.

107. Polycarpe Kalembwe and Albert Stewart were paid on the RF CUNY Crosswalks budget line.

108. Polycarpe Kalembwe and Albert Stewart  received a memo from Wendy Patitucci, Director of Employment Policy and Practice at RF CUNY which was forwarded by Yocasta Delgado, Director of Administration of the Crosswalks RF CUNY employees.

109.  This memo stated that a mandatory meeting would be held on March 26, 2003 for all RF CUNY Crosswalks employees.

110.  At the meeting,  all the RF CUNY Crosswalks employees were given a memo stating that June 6, 2003 would be their last day of employment.

111.  At the meeting, the RF CUNY Crosswalks employees were told that the Memorandum of Understanding between DoITT and CUNY would terminate on June 6, 2003.

112. The RF CUNY Crosswalks employers were told their employment would terminate

at that time because they were paid on that budget.

113. The deadline to apply for jobs that had been posted on the DoITT Crosswalks budget line was March 27, 2004 which was only a day after this meeting.

114.  Mr. Kalembwe began working at Crosswalks in September, 1992.

115.  Mr. Kalembwe was the MIS Network Support Manager.

116.  Mr. Kalembwe's duties encompassed being the LAN administrator, MIS management, video library manager, broadcast MIS manager, and facility access security manager.

117. The position of Broadcast MIS Administrator was posted.  It was job JVN 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CW.

118.  Mr. Kalembwe's salary was encompassed in the posted salary range but the posted salary range went much higher.

119. Mr. Kalembwe applied for the position.

120. Mr. Kalembwe was qualified for the position.

121. The posted position was just a portion of the job that Mr. Kalembwe was already performing well.

122.  Mr. Kalembwe was interviewed for the position by Michael McKenna, his immediate supervisor who was the Senior Operations Manager.

123 .  Mr. Kalembwe did not get the position.

124.  During the interview, Mr. McKenna asked that Mr. Kalembwe check all the computers before June 6, 2003.

125. Mr. Kalembwe was not given the courtesy of being told he would not be getting the position.

126.  Mr. Kalembwe only learned that he did not get the position on June 5, 2003, the day before his last day of employment.
.

127. The employer continued to seek applicants after refusing to grant Mr. Kalembwe the position.

128.  Mr. Kalembwe was not offered any other positions in Crosswalks (NYC-TV) or DoITT.

129. Kalembwe took part with several co-workers in a group litigation against Crosswalks to complain about the discriminatory treatment of the minority employees. On August 31, 1998, that case was filed in the Southern District of New York. The index number was 98 CIV 7316 (BSJ).

130.  As part of the case, Mr. Kalembwe set forth all the discriminatory behavior that he had been subjected to on the basis of race and national origin.

131. That case was dismissed by Order of the court dated February 21, 2002.

132. Mr. Stewart filed a racial discrimination and retaliation complaint in the Southern District of New York against Crosswalks, DoITT and the City of New York. That was Index Number 97 CIV 9268 (BSJ).
.

133. When the City brought a motion for summary judgment against Mr. Stewart, in the fall of 2000, Mr. Kalembwe provided an affidavit in support of Mr. Stewart detailing what relevant information he knew.

134. Mr. Stewart was scheduled for a trial in 2002.

135.  A proposed pretrial order was prepared and Mr. Kalembwe was placed on the witness list.

136. A draft of this pretrial order was sent to the employers' attorneys in March, 2002.

137.  The case settled in late August, 2002 and did not go to trial.

138 . In the last two years of his employment, Mr. Kalembwe was absent more than he had been years prior.

139.  It began when Mr. Kalembwe had problems with his knee which required physical therapy. Later, he developed diabetes which caused him to be absent.

140.  The absences were because of the disease itself and from the side effects of the medication.

141. Mr. Kalembwe was given a difficult time because of the use of his sick time.

142. Mr. Kalembwe was able to perform his job.

10

143. Arick Wierson, aided and abetted in discriminating against Mr. Kalembwe.

144. Arick Wierson participated in the decision not to retain or to not hire Mr. Kalembwe.

145. Yocasta Delgado  aided and abetted in discriminating against Mr. Kalembwe.

146. Yocasta Delgado participated in the decision to not retain or not hire Mr. Kalembwe.

147. Seth Unger participated in the decision not to retain or not hire Mr. Kalembwe.

148. Seth Unger, aided and abetted in discriminating against Mr. Kalembwe.

149. Albert Stewart's employment was terminated on June 6, 2003.

150. Mr. Stewart began working on Crosswalks television studio productions as a college assistant while employed by Bronx Community College in 1992.

151. Mr. Stewart worked on many of the shows as an assistant director.

152. Mr. Stewart was hired by Crosswalks in the title of Transmission Operator on September 13,1993.  Functionally, a Transmission Operator is the same as a  Master Control operator.

153. Mr. Stewart worked as a Director, Assistant Director, Studio Coordinator, Cameraman,  Crew Chief and a Master Control operator at Crosswalks.

154. At the time of Mr. Stewart's  termination he was working only as a Master Control operator.

155. At the meeting of March 26, 2003, Mr. Stewart  asked whether DoITT would be absorbing the RF CUNY Crosswalks employees. The representatives at the meeting did not know.

156. Mr. Stewart went to the recruiting office of DoITT and hand delivered four resumes for four positions and had them time-stamped by the receptionist.

157. The four positions were Master Control Operator, Electronic News Gathering (ENG) supervisor, Nighttime Producer and Camera Operator.

158. Mr. Stewart was qualified for all four.

159. The master control operator position was the one that Mr. Stewart was currently performing.

160. Of the people retained in this position, Mr. Stewart had the most seniority and therefore the most experience.

161. Mr. Stewart did not get an interview for this position.

162. Mr. Stewart was not given this position.

163. The employer hired people who had been on the RF CUNY Crosswalks budget.

164. Upon information and belief, one is white, one is black and one is Asian.

165. In addition, the employer hired at least one person from outside of DoITT and Crosswalks.

166. Mr. Stewart was as qualified if not more qualified than at least some of the people retained or hired.

167. Upon information and belief, all the people the employer retained or hired for the position of master control operator are younger than Mr. Stewart.

168. The master control department and the entire network were going to be moving to a new facility with state of the art digital technology.

169. All of the staff would need to be retrained on the new technology.

170. Upon information and belief, Mr. Stewart was not making a higher salary than the other master control operators.

171. ENG is the Electronic News Gathering department which is the field camera crew.

172. Mr. Stewart is qualified for the position of ENG supervisor.

173. Mr. Stewart had worked for years as a cameraman for Crosswalks.

174. Mr. Stewart had also worked as a ENG Crew chief.

175. Mr. Stewart did not receive an interview for this position.

176. Mr. Stewart was not granted this position.

177. The person who was given this position was Steven Vigilante, a white male.

178. Steve Vigilante was also a RF CUNY employee.

179. The third position was for night time producer.

180. Mr. Stewart was qualified for the position.

181.  Mr. Stewart did not get an interview for this position.

182.  Mr. Stewart was not granted this position.

183.  This position was given to a light skinned black male employee, Steven Butler.

184. Mr. Butler was on the RF CUNY Crosswalks budget.

185.  The fourth position was for Camera Operator.

186. Mr. Stewart was qualified for the position.

187. Mr. Stewart had worked satisfactorily for years as a cameraman for Crosswalks.

188. Mr. Stewart had an interview for the Camera Operator position with Michael McKenna, the Senior Operations Manager who was his immediate supervisor.

189. This was the only interview that Mr. Stewart  received.

190. Mr. McKenna was not interviewing him for any other position.

.    191. Mr. Stewart was not granted the position.

192. People were hired or retained from the RF CUNY Crosswalks budget line.

193. Upon information and belief, all the people retained by the employer for the camera operator position are younger than Mr. Stewart.  Some of these people are white.

194.  The employer also hired two white males from outside DoITT and Crosswalks to fill the position.

195.  Upon information and belief, these two people are younger than Mr. Stewart.

196.   Mr. Stewart was not offered any other positions in Crosswalks (NYC-TV) or DoITT.

197.    Mr. Stewart had filed a charge of discrimination with the New York State Division

of Human Rights on January 17, 1997. He commenced an action in the United States District Court of the Southern District of New York in December, 1997. The index number was 97 CIV 9268 (BSJ).

198. The matter involved extensive discovery proceedings.

199. A proposed joint pretrial order was drafted and sent to the attorneys for the employer in March, 2002.

200. A settlement agreement was entered into on August 26, 2002.

201. Part of that settlement was that Mr. Stewart was supposed to receive two checks. One was to come from the Comptroller's Office of the City of New York. The other one was to come from RF CUNY on behalf of DoITT.

202. The Comptroller's check was issued within a reasonable period of time.

203. The check that was being issued by RF CUNY that had to be authorized by DoITT had a extremely long and unexplained delay.

204. Mr. Stewart was not given an explanation for the delay.

205. It was not until March, 2003, that Mr. Stewart was finally told he could go and pick up the check.

206. This was happening at the same time as the RF CUNY employees were being told that they were to be terminated.

207. Mr. Stewart went to the RF CUNY office to pick up the check on March 27, 2003.

208. This was the day after the meeting where the RF CUNY Crosswalks employees had been told they were being terminated.

209. In addition to the above case where Mr. Stewart was the sole plaintiff, he took part with several co-workers in a group case against their employer to complain about the discriminatory treatment of the minority employees. This is the same case where Mr. Kalembwe was a plaintiff.

210. On August 31, 1998, that case was filed in the United States District Court of the Southern District of New York. The index number was 98 CIV 7316(BSJ).

211. By Court order, all plaintiffs' claims were dismissed except for the claims of two plaintiffs. Mr. Stewart's claim was one of the two not dismissed.

212.  As part of preparing for trial and to narrow the issues, Mr. Stewart agreed to relinquish his claims in that suit at a pretrial conference held on or about March 26, 2002.

213.  Arick Wierson aided and abetted in discriminating against Mr. Stewart.

214.  Michael McKenna aided and abetted in discriminating against Mr. Stewart.

215. Arick Wierson participated in the decision not to retain or hire Mr. Stewart.

216.   Mr. McKenna participated in the decision not to retain or hire Mr. Stewart.

217.   On June 10, 2003, there was a meeting where Arick Wierson, General Manager, Seth Unger, the Director of Programming and Yocasta Delgado, the Director of Administration told the remaining employees that they should tell their friends to apply for jobs at Crosswalks.

218.  Of the people let go from the RF CUNY Crosswalks budget line, Mr. Stewart and Mr. Kalembwe were the most or among the most senior and also were the most or among the oldest.

219.  Crosswalks has a history of mistreating its minority employees. Through the years there had been favoritism of whites over minorities. Light skinned blacks and Hispanics were treated better than dark skinned blacks. This treatment went to promotion, raises and chances for advancement.

220. Upon information and belief, black Crosswalks employees were disproportionately adversely affected by the employers' termination and failure to hire or retain employees due to the stated reason of  budget cuts.

221. Ms. Gaffney,  Mr. Kalembwe and Mr. Stewart are all dark complexioned black.

222. There are no black employees in higher management.

223. None of the RF CUNY people who were not retained were white.

224.  The failure of the employer to treat black employees equally is so widespread, permanent and well settled so as to constitute the official policy, practice or custom of Defendants.

225. Defendants, acting under color of law and pursuant to their official policy, practice or custom, intentionally, knowingly and or with deliberate indifference for the rights of Plaintiffs, discriminated against them in selecting them to not be retained or hired during the stated budget cuts on the basis of their race and color.

226. As a direct and proximate result of the acts of Defendants as set forth herein, Plaintiffs were deprived of their rights under the Thirteenth Amendment to the Constitution of the United States as protected by 42. U.S.C. Sec. 1981.

227.  As a direct and proximate result of the acts of Defendants as set forth herein, Plaintiffs were deprived of their rights under the Fourteenth Amendment to the Constitution of the United States.

228. The acts of Defendants as set forth herein violated 42 U.S.C. 1983.

AS AND FOR A FIRST CAUSE OF ACTION: Civil Rights Act of 1866 (1981)

229. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 228 as if set forth herein.

230. This claim is brought against Defendants, jointly and severally.

231. Defendants have violated the CIVIL RIGHTS ACT OF 1866 (1981) by discriminating against the Plaintiffs on the basis of race and color in the terms and conditions of their employment.

232. As a result of the Defendants' discriminatory actions, Plaintiffs have suffered and continue to suffer mental anguish, emotional distress and other compensable injuries.

233.  In taking the above described discriminatory actions, the Defendants acted with malice and reckless indifference to Plaintiffs' rights pursuant to the CIVIL RIGHTS ACT OF 1866 giving rise to punitive damages.

AS AND FOR A SECOND CAUSE OF ACTION: TITLE VII

234. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 233 as if set forth herein.

235. This claim is brought against Defendants, jointly and severally.

236. Defendants have violated  Title VII by discriminating against the Plaintiffs on the basis of race and color in the terms and conditions of their employment.

237. As a result of the Defendants' discriminatory actions, Plaintiffs have suffered and continue to suffer mental anguish, emotional distress and other compensable injuries.

AS AND FOR A THIRD  CAUSE OF ACTION:
HUMAN RIGHTS LAW - RACE AND COLOR DISCRIMINATION

238. Plaintiffs repeat and realleges each and every allegation of paragraphs 1 through 237 as if set forth herein.

239. This claim is brought against the Defendants, jointly and severally.

240. By terminating Plaintiffs, Defendants discriminated against them in the terms and conditions of their employment on the basis of their race and color, in violation of the Human Rights Law.

241. Defendants have intentionally discriminated against Plaintiffs in the terms and conditions of their employment based upon race and color in violation of the Human Rights Law.

242. As a result of the Defendants' discriminatory actions, Plaintiffs have suffered and continue to suffer mental anguish, emotional distress, and other compensable injuries.

## AS AND FOR A FOURTH CAUSE OF ACTION:
### ADMINISTRATIVE CODE   -   RACE AND COLOR

243.  Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 242 as if set forth herein.

244. This claim is brought against the Defendants, jointly and severally.

245. By terminating Plaintiffs, Defendants discriminated against them in the terms and conditions of their employment on the basis of their race and color, in violation of the Administrative Code.

246. Defendants have intentionally discriminated against Plaintiffs in the terms and conditions of their employment based upon race in violation of the Administrative Code.

247. In taking the above described discriminatory actions, the Defendants acted with malice and reckless indifference to Plaintiffs' rights pursuant to the Administrative Code giving rise to punitive damages.

248. As a result of the Defendants' discriminatory actions, Plaintiffs have suffered and continue to suffer mental anguish, emotional distress, and other compensable injuries.

## AS AND FOR A FIFTH CAUSE OF ACTION: TITLE VII: RETALIATION

249. Plaintiffs,  Polycarpe Kalembwe and Albert Stewart repeat and reallege each and every allegation of paragraphs 1 through 248 as if set forth herein.

250. This claim is brought against Defendants, jointly and severally.

251. Defendants have violated Title VII by retaliating  against Mr. Kalembwe and Mr.

17

Stewart for complaining, participating in a protected activity or opposing discrimination.

252. As a result of the Defendants' discriminatory actions, Plaintiffs have suffered and continue to suffer mental anguish, emotional distress and other compensable injuries.

253. In taking the above described discriminatory actions, the Defendants acted with malice and reckless indifference to Plaintiffs' rights pursuant to Title VII giving rise to punitive damages.

254. As a result of Defendants' discriminatory actions, Plaintiffs have suffered and continue to suffer mental anguish, emotional distress, and other compensable injuries.

## AS AND FOR A SIXTH CAUSE OF ACTION: HUMAN RIGHTS - RETALIATION

255. Plaintiffs, Polycarpe Kalembwe and Albert Stewart repeat and reallege each and every allegation of paragraphs 1 through 254 as if set forth herein.

256. This claim is brought against Defendants, jointly and severally.

257. Defendants have violated the Human Rights law by retaliating against them for complaining, participating in a protected activity or opposing discrimination.

258. As a result of the Defendants' discriminatory actions, Plaintiffs have suffered and continue to suffer mental anguish, emotional distress and other compensable injuries.

## SEVENTH  CAUSE OF ACTION: ADMINISTRATIVE CODE : RETALIATION

259. Plaintiffs, Polycarpe Kalembwe and Albert Stewart repeat and reallege each and every allegation of paragraphs 1 through 258 as if set forth herein.

260. This claim is brought against Defendants, jointly and severally.

261.  Defendants have violated the Administrative Code by retaliating  against them for complaining, participating in a protected activity or opposing discrimination.

262. As a result of the Defendants' discriminatory actions, Plaintiffs have suffered and continue to suffer mental anguish, emotional distress and other compensable injuries.

263. In taking the above described discriminatory actions, the Defendants acted with malice and reckless indifference to Plaintiffs' rights pursuant to the Administrative Code giving rise to punitive damages.

264. As a result of Defendants' discriminatory actions, Plaintiffs have suffered and continue to suffer mental anguish, emotional distress, and other compensable injuries.

## AS AND FOR A EIGHTH  CAUSE OF ACTION:
### Title VII - Gender -

265. Plaintiff, Robin Gaffney repeats and realleges each and every allegation of paragraphs 1 through 264 as if set forth herein.

266. This claim is brought against the Defendants, jointly and severally.

267. By terminating Plaintiff, Defendants discriminated against her in the terms and conditions of her employment on the basis of her gender, in violation of Title VII.

268. Defendants have intentionally discriminated against her in the terms and conditions of her employment based upon gender in violation of Title VII.

269. As a result of the Defendants' discriminatory actions, Plaintiff has suffered and continues to suffer mental anguish, emotional distress, and other compensable injuries.

## NINTH CAUSE OF ACTION:   HUMAN RIGHTS - GENDER

270. Plaintiff, Robin Gaffney repeats and realleges each and every allegation of paragraphs 1 through 269 as if set forth herein.

271. This claim is brought against the Defendants, jointly and severally.

272. By terminating Plaintiff, Defendants discriminated against her in the terms and conditions of her employment on the basis of her gender, in violation of the Human Rights Law.

273. Defendants have intentionally discriminated against Plaintiff in the terms and conditions of her employment based upon gender in violation of the Human Rights Law.

274. As a result of the Defendants' discriminatory actions, Plaintiff has suffered and continues to suffer mental anguish, emotional distress, and other compensable injuries.

## TENTH CAUSE OF ACTION:
### ADMINISTRATIVE CODE - GENDER

19

275. Plaintiff, Robin Gaffney repeats and realleges each and every allegation of paragraphs 1 through 274 as if set forth herein.

276. This claim is brought against the Defendants, jointly and severally.

277. By terminating Plaintiff, Defendants discriminated against her in the terms and conditions of her employment on the basis of her gender, in violation of the Administrative Code.

278. Defendants have intentionally discriminated against Plaintiff in the terms and conditions of her employment based upon gender in violation of the Administrative Code.

279. As a result of the Defendants' discriminatory actions, Plaintiff has suffered and continues to suffer mental anguish, emotional distress, and other compensable injuries.

280. In taking the above described discriminatory actions, the Defendants acted with malice and reckless indifference to Plaintiff's rights pursuant to the Administrative Code giving rise to punitive damages.

## AS AND FOR AN ELEVENTH  CAUSE OF ACTION:
## ADA  - DISABILITY  DISCRIMINATION

281. Plaintiff, Polycarpe Kalembwe repeats and realleges each and every allegation of paragraphs 1 through 280 if set forth herein.

282. This claim is brought against the Defendants, jointly and severally.

283. By terminating Plaintiff, Defendants discriminated against him in the terms and conditions of his employment on the basis of his disability, in violation of the ADA.

284. Defendants have intentionally discriminated against Plaintiff in the terms and conditions of his employment based upon disability in violation of the ADA.

285. As a result of Defendants' discriminatory actions, Plaintiff has suffered and continues to suffer mental anguish, emotional distress, and other compensable injuries.

## AS AND FOR A TWELFTH  CAUSE OF ACTION:
## HUMAN RIGHTS LAW - DISABILITY

20

286. Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 286 as if set forth herein.

287. This claim is brought against the Defendants, jointly and severally.

288. By terminating Plaintiff, Defendants discriminated against him in the terms and conditions of his employment on the basis of his disability  in violation of the Human Rights Law.

289. Defendants have intentionally discriminated against Plaintiff in the terms and conditions of his employment based upon disability in violation of the Human Rights Law.

290. As a result of the Defendants' discriminatory actions, Plaintiff has suffered and continues to suffer mental anguish, emotional distress, and other compensable injuries.

<u>AS AND FOR A THIRTEENTH  CAUSE OF ACTION:</u>
<u>Administrative Code - Disability  Discrimination</u>

291.  Plaintiff, Polycarpe Kalembwe repeats and realleges each and every allegation of paragraphs 1 through 290 as if set forth herein.

292. This claim is brought against the Defendants, jointly and severally.

293. By terminating Plaintiff, Defendants discriminated against him in the terms and conditions of his employment on the basis of his disability, in violation of the Administrative Code.

294. Defendants have intentionally discriminated against Plaintiff in the terms and conditions of his employment based upon disability in violation of the Administrative Code.

295. In taking the above described discriminatory actions, the Defendants acted with malice and reckless indifference to Plaintiff's rights pursuant to the Administrative Code giving rise to punitive damages.

296. As a result of the Defendants' discriminatory actions, Plaintiff has suffered and continues to suffer mental anguish, emotional distress, and other compensable injuries.

<u>AS AND FOR A FOURTEENTH  CAUSE OF ACTION:</u>
<u>ADEA AGE DISCRIMINATION</u>

297. Plaintiffs, Polycarpe Kalembwe and Albert Stewart  repeats and realleges each and every allegation of paragraphs 1 through 296 as if set forth herein.

298. This claim is brought against the Defendants, jointly and severally.

290. By terminating Plaintiffs, Defendants discriminated against them in the terms and conditions of their employment on the basis of age, in violation of the ADEA.

291. Defendants have intentionally discriminated against Plaintiffs in the terms and conditions of their employment based upon age in violation of the ADEA.

292. As a result of the Defendants' discriminatory actions, Plaintiffs have suffered and continue to suffer mental anguish, emotional distress, and other compensable injuries.

<u>AS AND FOR A FIFTEENTH  CAUSE OF ACTION:</u>
<u>HUMAN RIGHTS LAW  - AGE DISCRIMINATION</u>

293. Plaintiffs  Polycarpe Kalembwe and Albert Stewart repeat and reallege each and every allegation of paragraphs 1 through 292 as if set forth herein.

294. This claim is brought against the Defendants, jointly and severally.

295. By terminating Plaintiffs, Defendants discriminated against them in the terms and conditions of their employment on the basis of age, in violation of the Human Rights Law.

295. Defendants have intentionally discriminated against Plaintiffs in the terms and conditions of their employment based upon age in violation of the Human Rights Law.

296. In taking the above described discriminatory actions, the Defendants acted with malice and reckless indifference to Plaintiffs' rights pursuant to the Human Rights Law giving rise to punitive damages.

297. As a result of the Defendants' discriminatory actions, Plaintiffs have suffered and continue to suffer mental anguish, emotional distress, and other compensable injuries.

<u>SIXTEENTH  CAUSE OF ACTION:</u>
<u>ADMINISTRATIVE CODE  - AGE DISCRIMINATION</u>

298. Plaintiffs Polycarpe Kalembwe and Albert Stewart repeats and realleges each and every allegation of paragraphs 1 through 297 as if set forth herein.

299. This claim is brought against the Defendants, jointly and severally.

300. By terminating Plaintiffs, Defendants discriminated against them in the terms and conditions of their employment on the basis of age, in violation of the Administrative Code.

301. Defendants have intentionally discriminated against Plaintiffs in the terms and

conditions of their employment based upon age in violation of the Administrative Code .

302. In taking the above described discriminatory actions, the Defendants acted with malice and reckless indifference to Plaintiffs' rights pursuant to the Administrative Code giving rise to punitive damages.

303. As a result of the Defendants' discriminatory actions, Plaintiffs have suffered and continues to suffer mental anguish, emotional distress, and other compensable injuries.

<u>AS AND FOR A SEVENTEENTH CAUSE OF ACTION: Civil Rights Act of 1866 (1983)</u>

304. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 303 as if set forth herein.

305. This claim is brought against Defendants, jointly and severally.

306. Defendants have violated the CIVIL RIGHTS ACT OF 1866 (1983) by discriminating against the Plaintiffs on the basis of race and color in the terms and conditions of their employment.

307. As a result of the Defendants' discriminatory actions, Plaintiffs have suffered and continue to suffer mental anguish, emotional distress and other compensable injuries.

308. In taking the above described discriminatory actions, the Defendants acted with malice and reckless indifference to Plaintiffs' rights pursuant to the CIVIL RIGHTS ACT OF 1863 giving rise to punitive damages.

WHEREFORE, PLAINTIFFS, respectfully requests that this Court enter a judgment:
a) declaring the acts and practices complained of herein to be violations of Title VII, Civil Rights Act (1981) and (1983), Americans with Disabilities Act of 1990, Age Discrimination in Employment Act, Human Rights Law the Administrative Code
b) enjoining and permanently restraining these violations.
c) directing Defendants to pay Plaintiffs compensatory damages;
d) directing Defendants pay Plaintiffs punitive damages;
e) directing Defendants to pay Plaintiffs liquidated damages;
f) awarding Plaintiff the costs of this action, together with reasonable attorney's fees;
g) and granting Plaintiff such other and further relief as the Court deems just and fair.

Respectfully submitted,

Dated December        2004

_____

23

Eugenie Gilmore (EG8528)
Attorney for Plaintiff
11 Broadway, Suite 400
New York, New York 10004
(212) 785-5585